Filed 11/17/23  P. v. Rufino CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDSON EDUARDO RUFINO,<br><br>    Defendant and Appellant. | B317048<br><br>(Los Angeles County Super. Ct. No. NA114241) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed in part, reversed in part, and remanded.

California Appellate Project, Richard B. Lennon and David Andreasen, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury found defendant Edson Eduardo Rufino guilty of, among other charges, second degree murder and assault with a deadly weapon.  On appeal, defendant argues that his second degree murder conviction must be vacated because he received ineffective assistance of counsel when his attorney failed to object to prosecutorial misconduct during closing argument.  He also asserts that he is entitled to a new trial based on certain instructional and evidentiary errors.  Alternatively, he seeks a remand for resentencing on one of the assault with a deadly weapon convictions pursuant to Assembly Bill No. 124 (2021–2022 Reg. Sess.), which the Attorney General concedes.

We reverse defendant's conviction on the murder count and remand for resentencing.  We otherwise affirm.

# II. BACKGROUND

A.   *Information*

The Los Angeles County District Attorney's Office filed an information charging defendant with:  the murder of Leandro Maza (Pen. Code, § 187, subd. (a)),[1] with an enhancement for personal use of a deadly weapon (§ 12022, subd. (b)(1)); two counts of assault with a deadly weapon, against victims Dennis Herrera and Daniela Gonzalez (§ 245, subd. (a)(1)); contempt of court (§ 166, subd. (c)(1)); and obstruction of a peace officer (§ 148, subd. (a)(1)).

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

B.    *Trial*[2]

   1.    Prosecution's Case

      Defendant, who was then 19-years old, was in a relationship with Nikole Rivera. She lived in a house in Long Beach with her adult brother, Herrera, and her mother, Figueroa. Murder victim Maza and his girlfriend, assault victim Gonzalez, also lived on the same property in a converted garage. Maza was 30 years old, 5 feet 11 inches tall, and weighed 245 pounds.

      In February 2020, Figueroa obtained a restraining order that required defendant to stay away from her home. On April 1, 2020, Figueroa told Maza and Gonzalez that defendant had physically abused Rivera.

      On the evening of April 2, 2020, Figueroa suspected that Rivera was hiding defendant in her bedroom. Figueroa shared her suspicion with Maza and Gonzalez, who were also inside the house.

      A little after 8:40 p.m., when Rivera went outside to move her car, Figueroa found defendant inside Rivera's bedroom. Figueroa directed defendant to "'[g]et the fuck out of [her] house." Defendant laughed and told Figueroa, "''You are going to pay for this.'''" Figueroa went outside to call 911.

---

[2]    Vilma Figueroa, Maria Andres, and Gonzalez all testified through a Spanish-language interpreter.

      Defendant does not dispute his convictions for contempt of court or obstruction of a peace officer. We therefore omit the facts supporting those counts from our recitation of the record.

3

When assault victim Herrera came home from work, he learned that Figueroa had called the police and went outside to talk to her.

Defendant then left the bedroom and went into the kitchen, where he encountered Gonzalez cooking. Defendant picked up a knife from the counter and pointed it at Gonzalez.[3] Gonzalez backed away in fear and told defendant to calm down.[4] She then screamed, causing Maza to come into the kitchen. Gonzalez told the police she and Maza tried to "detain" defendant and that Gonzalez put her hands on defendant's chest.

At that point, Herrera, who was still outside, heard a loud smashing sound (which was made by Rivera, who was trying to break the lock on the security bars to her bedroom window). Herrera told Rivera that he was going to "fuck up" her boyfriend. Rivera responded that Herrera should mind his own business.

Defendant, who was still armed with the knife, ran out the back door of the house and toward the front yard. Rivera followed closely behind. In the front yard, defendant confronted Herrera, holding the knife to his face and telling him to move.[5] Herrera complied. Defendant then told Herrera, "I thought you were going to fuck me up."

---

[3]   The knife was 12 inches long and had an eight-inch blade.

[4]   Gonzalez initially reported to police that defendant said, ""'I want to go. I don't care about anything. I'm going to kill you all.'"" At trial, however, Gonzalez could not recall defendant saying anything while he held the knife.

[5]   The prosecution played video for the jury from a security camera, which recorded the events outside the house.

By this time, Gonzalez and Maza had joined Figueroa and Herrera in the front yard. As defendant and Rivera walked along the street outside the house, Herrera challenged defendant to a fight. Defendant placed the knife on the trunk of a nearby parked car. Defendant and Herrera then yelled and cursed at one another. Maza told Rivera to listen to her mother, and Rivera told Maza to mind his own business.

Defendant began to walk away while looking back at the house. When Maza walked through the house's front gate toward defendant, defendant retrieved the knife. Defendant then placed the knife in his sweater pocket and, together with Rivera, eventually walked away from the house. Herrera and Maza followed.

Herrera picked up a baseball-sized rock and Maza picked up a five-foot, seven-inch-long metal pole. Maza and Herrera then began to chase defendant as he ran away from them.

Defendant eventually ran into the home of Maria Andres. He told the occupants of the house that he was afraid and to call the police. Herrera yelled to the occupants that defendant had a knife. Andres, her friend, and the friend's child immediately ran into a bedroom and locked themselves inside. Andres's son, who was inside another bedroom, called the police.

Shortly after defendant entered Andres's house, Herrera arrived at the house and stopped at the door. Herrera had dropped the rock somewhere along the path leading to Andres's house. When Maza got to the house, he stopped at the bottom of the four steps that led to the front door as he continued to hold the metal pole. Rivera arrived next and attempted, unsuccessfully, to push Herrera out of the way. Herrera pushed her back.

When defendant appeared at the front door, Herrera, who had been holding the front door shut, let him leave the house. As he walked out, defendant waved the knife at Herrera and cursed at him. Meanwhile, Maza and Rivera yelled at one another. Herrera saw defendant, who still held the knife, push Maza. Maza fell to the ground and dropped the pole.[6] When Maza got up, he said Herrera's name, and touched his now bloody chest. Herrera picked up the pole and struck defendant in the head. Defendant grabbed the pole from Herrera's hands. Maza fell backwards and Herrera caught him. Herrera stayed with Maza until the police arrived. Maza later died from a single stab wound to his chest.

Defendant ran away from the scene, but then returned in a car to pick up Rivera before driving away.

Hours later, the police arrested defendant, who then directed them to the location where he had discarded the knife. Officers also saw vomit nearby. Rivera had a bruise on the right side of her forehead and defendant had bruises on his arms and hands.

2.     Defense Case

   a.     Rivera's testimony

At the time of trial, Rivera remained in her relationship with defendant. On April 2, 2020, Rivera knew that defendant was violating a restraining order by being at Rivera's home. She believed it would be "bad" for defendant to leave the house

---

[6]     Herrera did not see Maza swing the pole at either defendant or Rivera.

through the front door. Rivera therefore tried to break her bedroom window's lock with a hammer.

When Rivera arrived at Andres's house, she asked Maza not to do anything, but Maza ignored her. She then struck Maza once or twice, and Maza responded by swinging the pole and hitting her on the head. Rivera "blacked out" from the strike, fell backward, and dropped her keys and phone.

Rivera then heard defendant say, "open the gate." Rivera complied, and she and defendant then ran down an alley, where Rivera vomited. She told defendant she needed to retrieve her dropped items and directed him to get his car. Rivera did not see defendant holding the pole.

Rivera heard Herrera ask for someone to call an ambulance, saw Maza on the ground, and ran away. She knew Maza had been stabbed. Rivera then got into defendant's car and the two drove away from the scene. She and defendant were eventually stopped by the police.

When Rivera spoke to the police, she falsely claimed that Maza pushed her prior to hitting her with the pole. At trial, she denied seeing defendant holding a knife at any time during the evening. And, she did not see Maza swing the pole at defendant.

b. Defendant's testimony

At the time of his offenses, defendant weighed 125 pounds. Defendant knew he could not be at Figueroa's home on April 2, 2020, because of the restraining order.

Rivera and defendant agreed that it would be best if defendant left the house through the window. Therefore, Rivera went outside to try to break the lock to the window. Defendant

7

heard Herrera tell Rivera, "'We all know that he is in there. We're going to fuck him up.'"

Defendant then left the bedroom because he felt pressured to do so. He saw Maza and Gonzalez standing at the front door. He tried to move toward the back door, but Gonzalez grabbed his sweater. Defendant tried to grab Gonzalez's hands and push her off him, but he was grabbed by Maza, who slammed him into the refrigerator and told him he was not going anywhere. Defendant responded by grabbing a kitchen knife and telling Gonzalez and Maza to let him leave. Maza and Gonzalez backed away and put up their hands. Defendant did not recall pointing the knife at them. He "grabbed the knife because [he] wanted to protect [himself] against this six-foot man [Maza]."

After defendant and Rivera exited the house, defendant saw Herrera standing at the front gate. Defendant pointed the knife at him and said, "'I thought you were going to fuck me up.'" Herrera backed away, saying, "'Chill, bro.'" Figueroa, Maza, and Gonzalez then joined defendant, Rivera, and Herrera in the front yard.

Defendant challenged Herrera to a fight. Defendant had beaten up Herrera two months earlier and was not afraid of him. Defendant, however, was fearful of the larger Maza. Herrera and Maza told defendant to put down the knife and "'fight like a man.'" Defendant placed the knife on the trunk of a parked car, but picked it up again when Maza stepped toward him. Maza and Herrera again told defendant to put the knife down. Rivera told Maza to mind his own business, and Maza told her to respect her mother.

Defendant and Rivera then walked away. Although defendant had planned to walk to his car, defendant started to

run when Herrera and Maza picked up weapons from the ground and began to pursue him.

Defendant eventually ran into a stranger's home and asked the two women inside to call the police. Herrera arrived shortly afterward and yelled for the women to call the police because defendant had a knife and "was going to kill everybody inside." The women fled to a bedroom. Herrera then locked the metal screen door. Defendant followed the women and again asked them to call the police. Herrera also repeated that the women should call the police.

Defendant saw Maza arrive and stand at the bottom of the steps, holding the pole. Rivera then arrived at the metal screen door and asked Herrera to let her and defendant leave. Herrera cursed at Rivera and pushed her away from the door. Defendant took this moment to exit the house. He "wanted to leave."

Defendant walked down the steps, past Rivera and Herrera, and encountered Maza. By this time, defendant had pulled the knife out of his pocket. As defendant tried to leave, Maza hit him in the right forearm with the pole. Defendant told Maza that Maza had "won" and defendant just wanted to leave. Maza continued to hit defendant with the pole. When Rivera tried to push Maza out of the way, Maza struck Rivera on the head with the pole, causing her to fall down.

Defendant was angry that Maza had struck Rivera. After Maza swung the pole a few more times at defendant, defendant stabbed Maza in the chest.

Defendant did not remember picking up the pole. Rivera told defendant to get the car. He threw the knife away as he ran.

After being detained, defendant spoke with the police.[7]  He told them that Gonzalez had pushed him.  He admitted falsely telling the police that Herrera had swung a crowbar at him before the stabbing.

C.    *Conviction and Sentencing*

Following trial, the jury convicted defendant of the second degree murder of Maza and all other charges.  The jury also found the deadly weapon allegation to be true.

The trial court sentenced defendant to 20 years to life, consisting of:  15 years to life on count 1, plus one year for the deadly weapon enhancement; the middle term of three years on count 2, to be served consecutively; and one year on count 3 (one-third the middle term of three years), to be served consecutively. The court stayed the sentences for counts 4 and 5 pursuant to section 654.  Defendant timely appealed.

---

[7]    Defendant's statements to the police were presented during the prosecution's rebuttal.

10

# III. DISCUSSION

A. *Prosecutorial Misconduct / Ineffective Assistance of Counsel*

Defendant contends that his counsel was ineffective in failing to object when the prosecutor committed prejudicial misconduct by misstating the law regarding voluntary manslaughter during closing argument.[8]

### 1. Background

During her closing argument, the prosecutor stated: "Heat of passion. It's not enough that this defendant was provoked. He can't set up his own standard of conduct. It's whether a person of average disposition in the same situation knowing the same facts would have reacted the same way and killed. So it's not the defendant's heat of passion. It's would a reasonable person have heat of passion and react and kill. Just something to think about when you are reviewing the evidence." Defense counsel did not object.

During his closing argument, defense counsel argued: "Now, there is another way to get rid of malice. That is heat of passion. This one is a little simpler. You have to be provoked. Requires provocation. Someone has to provoke you. Could be

---

[8] Defendant's failure to raise an objection forfeits his prosecutorial misconduct argument on appeal. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.)

lots of different kinds of provocation, but it's got to be something. And when that happens, the person has to act rashly. Passion over judgment. Okay? I wasn't thinking what I was doing. I was so upset that I acted. [¶] The classic law example is you walk in and someone is with your spouse and either he or she acts rashly without judgment. That is like the law school example. That is not this. But being attacked with a pole is close. [¶] Without due deliberation. You didn't think about it. Again, you didn't deliberate it. You acted rashly. What is important to realize is it doesn't mean it has to be objective, but it doesn't mean that you would have done what he did. It doesn't mean that you would have used the knife the way he did. All it means is that there is a reasonable chance that you would have acted rashly or without due deliberation as a result of a provocation. There is ample evidence that that's the case."

On rebuttal, the prosecutor argued: "Voluntary manslaughter heat of passion. Reasonable person gets mad and stabs? Nope. Don't get that one either. When you stab somebody because you're mad and you stab them in the chest, that's your malice." Defense counsel did not object.

### 2. Applicable Law

"Manslaughter is a lesser included offense of murder. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion

12

arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" (*People v. Barton* (1995) 12 Cal.4th 186, 201.)" (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted (*Beltran*).)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] '"To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'"' [Citation.]' [Citation.] '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549–550.)

The objective component of provocation need not be such that it would cause a person of average disposition to kill. "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an

emotion so intense that an ordinary person would simply *react*, without reflection. To satisfy [the standard in *People v. Logan* (1917) 175 Cal. 45], the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran, supra*, 56 Cal.4th at p. 949.) The People have the burden of proving beyond a reasonable doubt that the defendant did not kill because of heat of passion. (*Id.* at pp. 944–945; see CALCRIM No. 570.)[9]

---

[9] The jury was instructed on voluntary manslaughter and heat of passion with CALCRIM No. 570, which stated, in pertinent part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] . . . It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. *In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment*." (Italics added.)

Even when the trial court gives a correct instruction on heat of passion, such as with CALCRIM No. 570, a prosecutor's misstatements can still result in error. (See *Beltran, supra*, 56 Cal.4th at p. 954 [finding prosecutor's examples that suggested "the jury should consider the ordinary person's conduct and whether such a person would kill" was incorrect standard and "muddied the waters" regarding the jury's understanding of the court's instructions]; see also *People v. Collins* (2021) 65 Cal.App.5th 333, 341 (*Collins*) [finding prosecutorial error where prosecutor repeatedly misstated law regarding fear as element of robbery during closing argument, even though court delivered correct instruction].) "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation] . . . .' [Citations.] To establish such error, bad faith on the prosecutor's part is not required. [Citation.] '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error. [Citation.]'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).)

"To demonstrate ineffective assistance of counsel, [defendant] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citations.] On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.]

'[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

### 3. Analysis

We conclude that the prosecutor here misstated the law when, during closing argument, she described the objective standard for heat of passion as "whether a person of average disposition in the same situation knowing the same facts would have reacted the same way and killed." She then compounded the misstatement by adding, "So it's not the defendant's heat of passion. It's would a reasonable person have heat of passion and react and kill." The prosecutor's argument that the heat of passion doctrine did not apply if defendant's reaction was not a reasonable one, is directly contrary to *Beltran, supra*, 56 Cal.4th at page 949, which emphasized that the jury need not find that defendant's action in response to a provocation be reasonable, and that the proper focus is on defendant's state of mind, not his act.

Thus, we next consider whether defense counsel was ineffective in failing to object to the argument. According to the Attorney General, defense counsel may have rationally decided that he should not focus on the prosecutor's argument regarding provocation because counsel's own argument was sufficient on the issue of reasonableness and the jury instruction appropriately conveyed the law. We disagree.

16

Defense counsel argued extensively during closing argument that defendant acted without malice and emphasized, among other things, the evidence that supported a finding that defendant had acted under the heat of passion. And, defense counsel's own argument regarding heat of passion, albeit correct, did not adequately cure the prosecutor's initial misstatement of the law. Indeed, in *Beltran, supra*, 56 Cal.4th 935, our Supreme Court noted that, after the prosecutor's closing argument misstated the law, "[d]efense counsel's jury argument countered the prosecutor's statements and suggested the law 'doesn't say the provocation would have caused a person of average disposition to kill . . . . [I]nstead the law is provocation that causes a person to act rashly impulsively without thinking.'" (*Id.* at pp. 954–955.) Nonetheless, our Supreme Court found that "[t]hese competing formulations by the advocates may have confused the jury's understanding of the court's instructions." (*Id.* at p. 955.)

Moreover, even after defense counsel correctly stated the standard for heat of passion, the prosecutor, who had the last word, again misstated the requirements for heat of passion. During rebuttal, the prosecutor asked the rhetorical question, "Reasonable person gets mad and stabs?" and answered it by stating, "Nope." By so doing, the prosecutor reiterated, contrary to *Beltran, supra*, 56 Cal.4th 935, that in order to reduce the murder charge to voluntary manslaughter, the jury was required to find that defendant's act in response to the provocation was a reasonable one. On this record, we can conceive of no reasonable tactical purpose for defense counsel to not object to the prosecutor's misstatement of the law on this issue. (See *Centeno, supra*, 60 Cal.4th at pp. 675–676 [finding error when defense

17

counsel failed to object to prosecutor's example during closing argument, which lowered the prosecutor's burden of proof].) Accordingly, we conclude counsel's performance was deficient.

We next consider whether defendant was prejudiced by counsel's failure to object to the prosecutor's misstatement. "Prejudice means a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] A reasonable probability means a 'probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Najera* (2006) 138 Cal.App.4th 212, 225; accord, *People v. Kaihea* (2021) 70 Cal.App.5th 257, 268.)

Here, the error was prejudicial. Because the prosecutor's misstatement did not directly contradict CALCRIM No. 570, the jury could have reasonably construed it as a further, albeit legally incorrect, explanation of the court's instruction. (*Beltran, supra*, 56 Cal.4th at pp. 954–955; see *Collins, supra*, 65 Cal.App.5th at p. 341.) And, unlike in *Beltran*, the trial court did not clarify the instruction to the jury. (*Beltran, supra*, 56 Cal.4th at p. 956.) Further, the jury, after being instructed that "[p]rovocation may reduce a murder from first degree to second degree" (CALCRIM No. 522), found defendant guilty of second degree murder and therefore necessarily found that defendant subjectively acted rashly and without due deliberation. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000.) Finally, the evidence of provocation was relatively strong. (See *People v. Weaver* (2001) 26 Cal.4th 876, 971 [considerations of prejudice include, among other things, whether there was "overwhelming negative evidence against defendant"]; *In re Gay* (2020) 8 Cal.5th 1059, 1087 ["How readily deficient performance undermines confidence in the trial's outcome will in part depend on the strength of the

18

trial evidence on any decisive points. A 'verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support'"].)

Both defendant and Rivera testified that Maza struck Rivera in the head with a metal pole. Defendant also testified that Maza then used the pole to strike him. The physical evidence supported defendant and Rivera's testimony, as Rivera had bruising to her forehead and defendant had bruises on his arms and hands. Herrera's contrary testimony, that he did not see Maza swing the pole, was not so overwhelming as to render the prosecutor's misstatement harmless.

We reject the Attorney General's contention that the lack of credibility in defendant and Rivera's testimony supports a contrary result. Although defendant and Rivera admitted that some of their trial testimony differed from what they told the police, those inconsistencies do not render the evidence against defendant so overwhelming that the prosecutor's misstatement of the law as to heat of passion was harmless.[10] We therefore must reverse defendant's conviction for second degree murder.[11]

---

[10] The Attorney General contends that Maza and Herrera were engaged in a citizen's arrest of defendant (see § 837), and thus any conduct in restraining defendant was not sufficient provocation because "the individual that committed the offense has a duty not to resist." We disagree. The Attorney General has cited no legal authority in support of his conclusion that force used during a citizen's arrest is insufficient provocation for heat of passion as a matter of law, and we have found none.

[11] Because we reverse for a new trial on the second degree murder conviction for count 1, we need not discuss the parties'

19

B.    *Instructional Error*

1.    Self-Defense in Non-Homicide Cases

Defendant next argues that the trial court erred by failing to instruct the jury with CALCRIM No. 3470, which explains the right to self-defense and defense of another for non-homicide crimes.

"We review claims of instructional error de novo.  (*People v. Cole* (2004) 33 Cal.4th 1158.)  'The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law."'  (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111–1112.)  ""In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given."'"  (*Ibid*.)"  (*People v. Waxlax* (2021) 72 Cal.App.5th 579, 591 (*Waxlax*).)

The trial court instructed the jury on self-defense with CALCRIM No. 505, which describes the right to self-defense in homicide crimes, but it did not additionally instruct the jury with CALCRIM No. 3470.  We conclude the court thereby erred.  (See *Waxlax, supra*, 72 Cal.App.5th at pp. 591–592 ["The difference between CALCRIM No. 3470 and CALCRIM No. 505—that is, the difference between self-defense in the homicide context and self-defense that will justify an assault—lies in the type of the threat the defendant believed they faced.  To justify a homicide or

---

other arguments concerning instructional error regarding self-defense and homicide.

20

attempted homicide, the defendant must believe that 'danger [of death]' or 'great bodily [injury]' is imminent, whereas an assault committed in self-defense may be justified if the defendant feared that any 'bodily injury,' or even an 'unlawful touching,' was imminent.  For both homicide and assault, the amount of force the defendant uses must be no more than reasonably necessary to fend off the perceived threat"].)[12]

We conclude, however, that the trial court's error was harmless under either the *Watson* or *Chapman*[13] standard of review.  (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 199 ["we have yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error"].)[14]

---

[12]   We reject the Attorney General's contention that defendant forfeited the instructional error here.  Because the trial court had a sua sponte duty to instruct, there was no trial action required by the defendant to preserve his argument for appeal.  (*People v. Andrews* (2015) 234 Cal.App.4th 590, 601, fn. 4.)

Because we conclude the trial court had a sua sponte duty to give CALCRIM No. 3470, we do not consider defendant's alternative argument that his counsel provided ineffective assistance by failing to request it.  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1136, fn. 7.)

[13]   *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) and *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

[14]   Under the federal test for prejudice, the state must demonstrate that the error was harmless beyond a reasonable doubt.  (*Chapman, supra*, 386 U.S. at p. 24.)

"""To justify an act of self-defense for [an assault charge under section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.'" [Citation.] . . . Additionally, '[t]he threat of bodily injury must be imminent' and the force used in response '"reasonable under the circumstances.'" [Citation.]" (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014.)

As to Herrera, although he earlier said that he would "fuck [defendant] up," by the time defendant pointed a knife at him, Herrera was unarmed, standing by the front gate of his home, and had not touched defendant. Moreover, defendant testified that he was not afraid of Herrera and had defeated him in a fight two months earlier. We conclude no jury would have found defendant's use of the knife against Herrera to be reasonable.

As to Gonzalez, under defendant's version of events, she grabbed defendant's sweater and Maza slammed him into a refrigerator. But, defendant admitted that when he grabbed the knife and told Gonzalez and Maza that they had to let him leave, Gonzalez and Maza immediately put up their hands. The jury, having convicted defendant of assault with a deadly weapon, necessarily found that: (1) the knife was a deadly weapon, (2) defendant did an act that by its nature would directly and probably result in force being applied to Gonzalez, and (3) the force was likely to produce great bodily injury.[15] (See CALCRIM

---

[15] The jury was instructed that, to convict defendant of assault with a deadly weapon, "the People must prove that [¶] [1.] The defendant did an act that by its nature would directly and probably result in the application of force to a person, and [¶] . . . The force used was likely to produce great bodily injury; [¶] [2.] The defendant did that act willfully; [¶] [3.] When the

22

No. 875; *People v. Chhoun* (2021) 11 Cal.5th 1, 30 [courts presume juries follow the instructions].) Thus, even if defendant's initial grabbing of the knife was reasonable, his subsequent act, which the jury found constituted an act that would directly and probably result in force that was likely to produce great bodily injury to Gonzalez, was not. Even assuming that defendant reasonably considered Maza and Gonzalez to be part of the same group, such that he associated Maza's threat with Gonzalez (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065–1066), no jury could have concluded that defendant's assault with a deadly weapon was objectively reasonable under the circumstances here. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 966, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459 ["The right of self-defense did not provide defendant with any justification or excuse for using deadly force to repel a nonlethal attack"]; *People v. Enriquez* (1977) 19 Cal.3d 221, 228, disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [assault with fists does not justify use of deadly weapon in self-defense]; see also *People v. Jones* (1961) 191 Cal.App.2d 478, 482 ["A

---

defendant acted, he was aware of the facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] . . . AND . . . [¶] [4.] When the defendant acted, he had the present ability to apply force with a deadly weapon to a person; [¶] . . . AND [¶] 5. The defendant did not act in self-defense . . . . [¶] . . . [¶] A *deadly weapon* is any object, instrument, or weapon . . . that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." Defendant does not dispute the correctness of the instruction on assault with a deadly weapon.

23

misdemeanor assault must be suffered without the privilege of retaliating with deadly force"].) Accordingly, we find the error harmless beyond a reasonable doubt.

### 2. CALCRIM No. 3471

Defendant next contends that the trial court erred in delivering CALCRIM No. 3471, the right to self-defense by a mutual combatant or an initial aggressor.[16] According to defendant, there was no substantial evidence to support the delivery of the instruction in connection with the assault with a deadly weapon counts because the evidence demonstrated that, if the jury believed Gonzalez, defendant did not act in self-defense and if it believed defendant, he was not the initial aggressor. And, defendant asserts that as to Herrera, there was no evidence that defendant defended himself against Herrera after being the

---

[16] As relevant here, the court instructed the jury: "A person who engages in mutual combat has a right to self-defense only if: [¶] 1. He actually and in good faith tries to stop fighting; [¶] 2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; [¶] AND [¶] 3. He gives his opponent a chance to stop fighting. [¶] A person who starts a fight has a right to self-defense only if: [¶] 4. He actually and in good faith tries to stop fighting; [¶] AND [¶] 5. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting. [¶] . . . [¶] If a person meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

24

initial aggressor or agreeing to fight him. (See *People v. Marshall* (1997) 15 Cal.4th 1, 39 ["A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration"].)

We find there was substantial evidence to support the instruction. According to both Gonzalez and Herrera, defendant acted as the initial aggressor in his interactions with them. Moreover, defendant makes no effort to explain how he was prejudiced by the court's delivery of CALCRIM No. 3471 with respect to the assault with a deadly weapon counts. Accordingly, any error was harmless. (*See People v. Debose* (2014) 59 Cal.4th 177, 205–206 [error of instruction on inapplicable legal theory reviewed under *Watson* reasonable probability standard].)

## C.     *Testimony Concerning Defendant's Domestic Violence*

Defendant next argues that the trial court prejudicially erred by allowing the prosecution to elicit Figueroa's testimony that she told Maza and Gonzalez about defendant's domestic violence toward Rivera. Prior to trial, defendant moved to exclude any mention of his alleged prior domestic violence against Rivera. Citing Evidence Code section 1250, the court ruled that Figueroa could discuss her statements to Maza and Gonzalez regarding defendant's prior violence against Rivera. We review the trial court's rulings regarding the admissibility of the evidence for an abuse of discretion. (*People v. Mataele* (2022) 13 Cal.5th 372, 413–414.)

Defendant argues, and the Attorney General concedes, that Evidence Code section 1250 did not render Figueroa's testimony admissible as an exception to the hearsay rule. Nonetheless,

25

"""we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm."""" (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

Figueroa's statement was admissible, not for the truth of the matter asserted, but to explain why Maza and Gonzalez, who heard the statements, behaved in a particular manner. "[A]n out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief." (*People v. Montes* (2014) 58 Cal.4th 809, 863 (*Montes*); *People v. Rosson* (1962) 202 Cal.App.2d 480, 486; see 1 Witkin, Cal. Evidence (5th ed. 2022) Hearsay, §§ 41, 46.) Here, neither Maza nor Gonzalez had met defendant prior to April 2. And, the prosecution argued that because of Figueroa's statements to them, Maza and Gonzalez attempted to restrain defendant when they saw him at the home. Further, the reasonableness of Maza and Gonzalez's conduct was relevant to the issue of whether defendant acted in self-defense when he assaulted Gonzalez and stabbed Maza. Thus, Figueroa's out-of-court statement was relevant and admissible. (*Montes, supra*, 58 Cal.4th at p. 864.). We find no abuse of discretion.

D.      *Failure to Instruct on English Translation of Witness Testimony*

Defendant next argues that the trial court erred by failing to instruct the jury with CALCRIM No. 121, which states in pertinent part: "Some testimony may be given in [a language other than English]. An interpreter will provide a translation for you at the time that the testimony is given. You must rely on the

26

translation provided by the interpreter, even if you understand the language spoken by the witness." As noted, several witnesses testified in Spanish.

As defendant concedes, no decisional authority requires a trial court to sua sponte deliver CALCRIM No. 121. And, even if we were to find that a court, under certain circumstances, was obligated to deliver CALCRIM No. 121—and we make no such finding here—defendant has failed to demonstrate how he was prejudiced by the absence of the instruction. (*People v. O'Malley* (2016) 62 Cal.4th 944, 991 ["'The relevant inquiry [when instructional error is claimed] is whether, "in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice"'"].) Here, there is no indication that the interpreters made any material errors in interpreting the original Spanish testimony into English, and we do not presume any such error. (See Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].) Nor can defendant establish that any potential differences between the original Spanish and interpreted testimony affected the jury's verdict. Thus, any assumed error is harmless. (See *People v. Larsen* (2012) 205 Cal.App.4th 810, 830 [failure to give pinpoint instruction reviewed under *Watson* harmless error standard].)[17]

---

[17] Defendant also argues there was cumulative error requiring reversal as to counts 1 through 3. "Under the 'cumulative error' doctrine, 'a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' (*People v. Hill* (1998) 17 Cal.4th 800, 844.) The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."' (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)"

E.      *Resentencing on Count 2*

Defendant contends that the cause must be remanded for resentencing on count 2 due to recent statutory amendments to section 1170, subdivision (b)(6).  The Attorney General agrees, as do we.  In any event, because we are reversing as to count 1, the trial court will be given the opportunity to fully resentence defendant.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Navarro* (2007) 40 Cal.4th 668, 681.)

---

(*People v. Thomas* (2021) 64 Cal.App.5th 924, 971.)  Having reviewed the entire record, we conclude there is no reasonable possibility that the trial court's assumed errors prejudiced defendant with respect to his convictions for counts 2 and 3. (*People v. Peoples* (2016) 62 Cal.4th 718, 805.)

## IV. DISPOSITION

The judgment is reversed as to defendant's second degree murder conviction on count 1. The case is remanded to the trial court with directions to (1) retry defendant, if the People so elect, on second degree murder; and (2) resentence defendant in a manner consistent with this opinion. Thereafter, the court is directed to file an amended and corrected abstract of judgment and transmit it to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


I concur:



RUBIN, P. J.


29

The People v. Edson Eduardo Rufino
B317048


BAKER, J., Dissenting



The majority opinion, which reverses defendant and appellant Edson Rufino's (defendant's) murder conviction, is an outlier. The majority concludes—solely on the direct appeal record—that defendant's trial attorney was constitutionally ineffective for not objecting to the prosecution's closing argument. Such a conclusion is rarely drawn. (*People v. Salcido* (2008) 44 Cal.4th 93, 172 ["'except in those rare instances where there is no conceivable tactical purpose for counsel's actions,' claims of ineffective assistance of counsel generally must be raised in a petition for writ of habeas corpus based on matters outside the record on appeal"]; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"].) I cannot join such an opinion, which may well carry with it professional consequences for the trial lawyers on both sides— even though the majority never mentions it. (Bus. & Prof. Code, § 6086.7, subd. (a)(2) [a court must notify the State Bar "[w]henever a modification or reversal of a judgment in a judicial proceeding is based in whole or in part on the misconduct, incompetent representation, or willful misrepresentation of an attorney"].)

In my view, there is no basis to conclude defendant's trial attorney provided ineffective assistance of counsel on this record. The red lines in this area of the law are very fine, compelling a prosecutor to address how an average person would react (with judgment obscured by passion) but not permitting comment on how an average person would react *that incorporates the particular facts of the case being tried* (i.e., arguing an average person would not kill under the circumstances). Because of these fine distinctions, the prosecution did at least arguably misstate the law in one aspect of its summation when it told the jury: "It's whether a person of average disposition in the same situation knowing the same facts would have reacted the same way and killed" and "It's would a reasonable person have heat of passion and react and kill."[1] But the defense thereafter explained—in detail—that this was not the law and the jury did not have to conclude "you would have done what [defendant] did." The prosecution, in rebuttal, then argued "Reasonable person gets mad and stabs? Nope. Don't get that one either. When you stab somebody because you're mad and you stab them in the chest, that's your malice." I see no clear misstatement of law in those short four sentences during rebuttal,[2] and the majority never

---

[1]     Other elements of the prosecution's argument on the same point, however, were unobjectionable. The prosecutor's statement that "[defendant] can't set up his own standard of conduct," for instance, was drawn straight from the CALCRIM-approved jury instruction.

[2]     It is certainly permissible to argue that when you stab somebody in the chest because you're mad, that's "your malice." So that leaves the prosecution's comment "Reasonable person gets mad and stabs? Nope. Don't get that one either."

2

explains why they are problematic—despite resting on those four sentences the entirety of its argument that the failure to object was supposedly inexplicable.

I accordingly believe there could be good reasons why defense counsel did not object to the prosecution's argument. Chief among them, the defense may have believed distinguishing permissible argument from impermissible argument in this area of the law is tricky and decided not to risk an overruled objection when its own closing argument (plus the instruction given to the jury) correctly stated the law and the prosecution's short response did not undermine the defense argument. I do not rule out the possibility that a more developed record might establish the absence of an objection arose from deficient performance, but there is no ineffective assistance of counsel requiring reversal looking at what we now have before us.

The remainder of defendant's claims of instructional error concerning homicide and self-defense are, in my view, unmeritorious. I agree with the majority's disposition of

---

Particularly in context of the permissible sentence I have just mentioned, we do not have to understand this comment as a misstatement of the objective provocation inquiry. It can instead be understood as an argument that defendant stabbed the victim because he was mad and that is evidence of malice, not provocation. And if such an understanding is possible, we should credit it. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1129 ["'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements'"].)

defendant's other contentions of error.  So I would affirm defendant's convictions and remand solely for resentencing.


BAKER, J.

4